E-FILED
Wednesday, 23 November, 2011  09:52:41 AM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

SCOTT WILSON

    Plaintiff

    v.

CITY OF EUREKA, ILLINOIS, an
Illinois Local Governmental Entity

    Defendant

Case No. 11-1433

**JURY DEMAND**

---

**COMPLAINT**

---

Now comes the Plaintiff, Scott Wilson, by Richard L. Steagall, his attorney, and complaining of the Defendant, City of Eureka, Illinois, an Illinois Local Governmental Entity, states:

## I.
## Jurisdiction & Venue

1. Jurisdiction to hear plaintiff's claims under Americans With Disabilities Act of 1991 and the Amendments of 2008, 42 U.S.C. §§ 12102 (1)-(4), 12111 (5), 12112, exists under 28 U.S.C. § 1337 (a). Supplemental jurisdiction to hear the state claims asserted exists under 28 U.S.C. § 1367 (a).

2. Plaintiff, Scott Wilson, was at all times material here, a resident of Woodford County, defendant City of Eureka, Illinois is a local governmental entity organized as a municipality in Woodford County, Illinois under the laws of the State of

1

Illinois and the conduct complained of occurred in the City of Eureka, Woodford

County, Illinois. Venue exists in this court under 28 U.S.C. § 1391 (a).  This case is

assigned to the Peoria Division of this court under Local Rule 40:1.

3.    The occurrence complained of occurred on **November 24, 2010** in the City

of Eureka, County of Woodford, and State of Illinois.

## II.
## The Parties

4.    Plaintiff, Scott Wilson was hired as a part time police officer in March,

2007 and then was employed as full time police officer by the City of Eureka on July,

2007. Eureka with a population of slightly over 5,000 persons. Prior to Wilson's

employment by Eureka, he was a City of Chicago Police Officer from October, 1999 to

August, 2006. He remained employed as a Eureka Police officer who was off work on a

line of duty disability until the City of Eureka as specifically alleged below until the

City of Eureka refused to allow him to return to work when released by his physician to

do so on November 24, 2010 and hired a replacement.

5.    Defendant, City of Eureka, Illinois, is an Illinois local governmental entity

organized and operating as a municipality in Woodford County, Illinois.  It has the

power to sue and be sued in its name City of Eureka under Section 2-2-12 of the Illinois

Municipal Code. 65 ILCS 5/2-2-12 (2008).

## III.
## The Events

6.    Wilson suffered herniated C-6-C-7 discs while gaining control of an

2

arrested suspect who was resisting in the course of his employment as a police officer
for the City of Eureka on October 4, 2008. He remained working and continued to work
when the herniated disc condition was diagnosed on June 15, 2009.

7.      Wilson was off work from June 15, 2009 until August 11, 2009 when an
examining physician retained by the City of Eureka's worker's compensation insurer
stated he could return  to work, but further testing should be done of his symptoms of
radiating pain and numbness in his left arm. Wilson worked as a police officer from
August 11, 2009 through December 22, 2009.

8.      Further testing of the symptoms in his left arm revealed a diagnosis of
cubital tunnel syndrome (scar tissue build-up around ulnar nerve in the elbow area).
Wilson went off work for surgery to repair the cubital syndrome on December 23, 2009.

9.      Recovery and physical therapy from the cubital tunnel syndrome ended
on March 9, 2010, but Wilson was still experiencing symptoms of radiating pain and
numbness of his left arm. Physical therapy for the herniated disc was attempted, but
was unsuccessful. He had a surgical fusion of the C-6-C-7 vertebrae performed on
August 6, 2010.

10.      Wilson was released to return work on light duty status as a police officer
after recovery and physical therapy on November 24, 2010.  Wilson was off work from
June 15, 2009 until August 11, 2009, returned to work through December 22, 2009, and
was off work from the December 23, 2009 cubital tunnel syndrome surgery and the
August 6, 2010 spinal fusion surgery until his November 24, 2010 release to return to

work.

11.     Wilson had a worker's compensation proceeding pending before the Illinois Industrial Commission.  On April 28, 2010, an an evidentiary hearing was held. The Arbitrator ruled Wilson's cubital tunnel syndrome and herniated cervial disc were related to his employment as a police officer and awarded him temporary total disability benefits from June 15, 2009 to August 11, 2009 and from December 23, 2009 through the date of April 28, 2010. The Arbitrator also ruled the prospective medical expenses for surgical fusion of the herniated cervical discs recommended by Wilson's treating orthopedic surgeon, Daniel Mulroney, M.D., Peoria, Illinois were to be paid by the City of Eureka.

12.     Wilson's full time position as a Eureka Police Officer was held open until July, 2010 when the City of Eureka sent him a July 28, 2010 letter postmarked July 27, 2010 informing Wilson he had been replaced as a Eureka Police Officer because he did not return to work on July 27, 2010. This was an impossibility as the letter directing him to return to work had been postmarked that same day.

13.     Beyond the impossibility of violation of an order to return to work on July 27, 2010 received by mail on July 28, 2010, Wilson was physically unable to work, a fact known to the managerial agents of the City of Eureka.

      A.     The Illinois Industrial Commission Arbitrator had ruled Wilson's injuries were work related and the prospective medical treatment including the cervical fusion surgery which was performed on August 6, 2010 was to be paid by the City of Eureka as necessary for treatment of Wilson's work related injuries.

4

      B.     Wilson was unable to return to work because of his herniated cervical disc and the scheduled August 6, 2010 surgery.

14.    The managerial agents of Eureka were informed by Wilson's physician, Daniel Mulcroney, M.D., Peoria, Illinois,  and their worker's compensation insurance carrier of Wilson's November 24, 2010 release to light duty work by Dr. Mulcroney, Wilson's treating physician for the herniated C-6-C-7 discs which fused surgically on August 6, 2010.

15.    Two part police officer positions were available at or shortly after Wilson's November 24, 2010 release to return to light duty work. The part time police positions were assigned to Eureka College a four year college with 765 students under a contract between Eureka and the College. The officers on duty at the College have the back-up of a full time officer. Wilson was ready, willing, and able to return to work at one or both positions at Eureka College and was physically and mentally able to perform the essential functions of a police officer.

16.    The City of Eureka hired John Garrett, who was a full time police officer with five years experience at the City of El Paso, Illinois (pop. 2870), and Brian Bristol, a City of Peoria fireman who had not completed the training required for Illinois police officers to the two open positions on March 7, 2011 knowing Wilson was ready, willing, and able to return work and was physically and mentally able to perform the essential functions of a police officer.

17.    Wilson sent a March 29, 2011 letter to the City of Eureka Chief of Police asking when he could return work. Wilson was told by Anne Sandvik, Administrator of

the City of Eureka, Illinois that he would be required to file an application for employment, which is the same as any prospective employee, despite Wilson's on the job injuries as a Eureka Police Officer.

## IV.
### Plaintiff's Claims

**A.    Statutes Involved**

**1.    Federal Statute**

18.    At all times material, there was in full force and effect in the United States a certain statute known as the Americans With Disabilities Act, 42 U.S.C. § 12111 et seq as amended by the Americans With Disabilities Amendments Act of 2008, which provided:

**§ 12102 Definition of Disability**

As used in this chapter:

(1) Disability

The term "disability" means, with respect to an individual--

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment (as described in paragraph (3)).

(2) Major life activities

(A) In general

For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping,

6

walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

(B) Major bodily functions

For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

(3) Regarded as having such an impairment

For purposes of paragraph (1)(C):

> (A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

> (B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

(4) Rules of construction regarding the definition of disability

The definition of "disability" in paragraph (1) shall be construed in accordance with the following:

(A) The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.

(B) The term "substantially limits" shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(E) (i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as--

(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

(II) use of assistive technology;

(III) reasonable accommodations or auxiliary aids or services; or

(IV) learned behavioral or adaptive neurological modifications.

(ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact enses shall be considered in determining whether an impairment substantially limits a major life activity.

(iii) As used in this subparagraph--

(I) the term "ordinary eyeglasses or contact lenses" means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

(II) the term "low-vision devices" means devices that magnify, enhance, or otherwise augment a visual image.

## §12111 Definitions

(1) Commission
The term "Commission" means the Equal Employment Opportunity Commission established by section 2000e-4 of this title.

(2) Covered entity
The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.

(5) Employer

(A) In general

8

The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, ...

7) Person, etc.

The terms "person", "labor organization", "employment agency", "commerce", and "industry affecting commerce", shall have the same meaning given such terms in section 2000e of this title.

(8) Qualified individual

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

## § 12112 Discrimination

(a) General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

## § 12117 Enforcement

(a) Powers, remedies, and procedures

The powers, remedies, and procedures set forth in sections 2000e-4, 2000e-5, 2000e-6, 2000e-8, and 2000e-9 of this title shall be the powers, remedies, and procedures this subchapter provides to the Commission, to the Attorney General, or to any person alleging discrimination on the basis of disability in violation of any provision of this chapter, or regulations promulgated under section 12116 of this title, concerning employment

2.    **Illinois Human Rights Act**

19.    At all times material, there was in full force and effect in the State of Illinois, a certain statute known as the Illinois Human Rights Act 775 ILCS 5/1-101 et seq. (2008), which provided:

**§ 1-102. Declaration of Policy**.

It is the public policy of this State:

(A) Freedom from Unlawful Discrimination. To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, order of protection status, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations.

**§ 1-103. General Definitions**.

When used in this Act, unless the context requires otherwise, the term:

(B) Aggrieved Party. "Aggrieved party" means a person who is alleged or proved to have been injured by a civil rights violation or believes he or she will be injured by a civil rights violation under Article 3 that is about to occur.

(C) Charge. "Charge" means an allegation filed with the Department by an aggrieved party or initiated by the Department under its authority.

(D) Civil Rights Violation. "Civil rights violation" includes and shall be limited to only those specific acts set forth in Sections 2-102, 2-103, 2-105, 3-102, 3-102.1, 3-103, 3-104, 3-104.1, 3-105, 3-105.1, 4-102, 4-103, 5-102, 5A-102, 6-101, and 6-102 of this Act.

(F) Complaint. "Complaint" means the formal pleading filed by the Department with the Commission following an investigation and finding of substantial evidence of a civil rights violation.

(G) Complainant. "Complainant" means a person including the Department who files a charge of civil rights violation with the Department or the Commission.

10

(H) Department. "Department" means the Department of Human Rights created by this Act.

(I) Disability. "Disability" means a determinable physical or mental characteristic of a person, including, but not limited to, a determinable physical characteristic which necessitates the person's use of a guide, hearing or support dog, the history of such characteristic, or the perception of such characteristic by the person complained against, which may result from disease, injury, congenital condition of birth or functional disorder and which characteristic: ....

(L) Person. "Person" includes one or more individuals, partnerships, associations or organizations, labor organizations, labor unions, joint apprenticeship committees, or union labor associations, corporations, the State of Illinois and its instrumentalities, political subdivisions, units of local government, legal representatives, trustees in bankruptcy or receivers.

(Q) Unlawful Discrimination. "Unlawful discrimination" means discrimination against a person because of his or her race, color, religion, national origin, ancestry, age, sex, marital status, order of protection status, disability, military status, sexual orientation, or unfavorable discharge from military service as those terms are defined in this Section.

## § 2-101. Definitions.

The following definitions are applicable strictly in the context of this Article.

(A) Employee.

(1) "Employee" includes:

(a) Any individual performing services for remuneration within this State for an employer;

(b) An apprentice;

(c) An applicant for any apprenticeship.

(2) "Employee" does not include:

(a) Domestic servants in private homes;

(b) Individuals employed by persons who are not "employers" as defined by this

Act;

(c) Elected public officials or the members of their immediate personal staffs;

(d) Principal administrative officers of the State or of any political subdivision, municipal corporation or other governmental unit or agency;

(e) A person in a vocational rehabilitation facility certified under federal law who has been designated an evaluee, trainee, or work activity client.

(B) Employer.

(1) "Employer" includes:

(a) Any person employing 15 or more employees within Illinois during 20 or more calendar weeks within the calendar year of or preceding the alleged violation;
(b) Any person employing one or more employees when a complainant alleges civil rights violation due to unlawful discrimination based upon his or her physical or mental handicap unrelated to ability or sexual harassment;

(c) The State and any political subdivision, municipal corporation or other governmental unit or agency, without regard to the number of employees;

## § 2-102. Civil Rights Violations--Employment.

It is a civil rights violation:

(A) Employers. For any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination or citizenship status. ....

## 7A-102. Procedures.

(A) Charge.

(1) Within 180 days after the date that a civil rights violation allegedly has been committed, a charge in writing under oath or affirmation may be filed with the Department by an aggrieved party or issued by the Department itself under the signature of the Director.

12

(2) The charge shall be in such detail as to substantially apprise any party properly concerned as to the time, place, and facts surrounding the alleged civil rights violation.

**5/8A-104. Relief; Penalties**

§ 8A-104. Relief; Penalties. Upon finding a civil rights violation, a hearing officer may recommend and the Commission or any three-member panel thereof may provide for any relief or penalty identified in this Section, separately or in combination, by entering an order directing the respondent to:

(A) Cease and Desist Order. Cease and desist from any violation of this Act.

(B) Actual Damages. Pay actual damages, as reasonably determined by the Commission, for injury or loss suffered by the complainant.

(C) Hiring; Reinstatement; Promotion; Backpay; Fringe Benefits. Hire, reinstate or upgrade the complainant with or without back pay or provide such fringe benefits as the complainant may have been denied.

(D) Restoration of Membership; Admission To Programs. Admit or restore the complainant to labor organization membership, to a guidance program, apprenticeship training program, on the job training program, or other occupational training or retraining program.

**§ 10-102. Court Actions**.

(A) Circuit Court Actions.

(1) An aggrieved party may commence a civil action in an appropriate Circuit Court not later than 2 years after the occurrence or the termination of an alleged civil rights violation or the breach of a conciliation or settlement agreement entered into under this Act, whichever occurs last, to obtain appropriate relief with respect to the alleged civil rights violation or breach. ....

**3.  Illinois Municipal Code**

20.  At all times material, there was in force and effect in the State of Illinois a certain statute known as the Illinois Municipal Code, 65 ILCS 5/1-1 et seq (2010), which provided:

**5/10-2.1-1. Appointment--Terms of office** [65 ILCS 5/10-2.1-1 (2010).

§ 10-2.1-1. Appointment--Terms of office. In every municipality with a population of at least 5,000 and not more than 250,000 which is not subject to Division 1 of this Article, and in every municipality with a population of less than 5,000 which adopts this Division 2.1 as provided in Section 10-2.1-27, including in either event any municipality incorporated and existing under a special charter, the mayor of the city, with the consent of the city council or the president of the village or incorporated town, with the consent of the board of trustees, shall appoint a board of fire and police commissioners. This board shall consist of 3 members, whose terms of office shall be 3 years and until their respective successors are appointed and have qualified, except as provided in Section 10-2.1-2. No such appointment, however, shall be made by any mayor or president within 30 days before the expiration of his term of office.

**§ 3.1-30-5. Appointed officers in all municipalities**.

(a) The mayor or president, as the case may be, by and with the advice and consent of the city council or the board of trustees, may appoint (1) a treasurer (if the treasurer is not an elected position in the municipality), (2) a collector, (3) a comptroller, (4) a marshal, (5) an attorney or a corporation counsel, (6) one or more purchasing agents and deputies, (7) the number of auxiliary police officers determined necessary by the corporate authorities, (8) police matrons, (9) a commissioner of public works, (10) a budget director or a budget officer, and (11) other officers necessary to carry into effect the powers conferred upon municipalities.

**5/10-2.1-17. Removal or discharge; investigation of charges; retirement**

Except as hereinafter provided, no officer or member of the fire or police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause ...

**§ 10-2.1-23. Disability or military leave--Grant by board.**

A person holding a position in a fire or police department who is injured while in the performance of his duties and because of such injury is temporarily unable to continue to perform his duties or who enters the military or naval service of the United States because of a war in which the United States is a party belligerent or as required by any Act of Congress shall, upon written application to the board, be granted a disability or military leave, as the case may be.

**§ 10-2.1-24. Return to active duty.**

A person who has been on disability or military leave granted by the board and who wishes to return to active duty in his certified position shall be credited seniority for the period of such leave and, if otherwise qualified, shall be reinstated to his certified position at the rank or grade held at the start of the leave, not more than 60 days after his written request for reinstatement is filed with the board. Such request shall be filed not more than 30 days after termination of the disability or military or naval service.

### B.    Plaintiff's Claims

#### 1.    Americans With Disabilities Act

21.    Wilson is a qualified individual with a disability under the Americans

With Disability Act in that his cubital tunnel syndrome specifically alleged in ¶ 7-10 and

the herniated C-6-C-7 discs specifically described in ¶ 9-14 substantially limited and the

residual effects after the surgeries substantially limit his arm movement and his back,

neck, and leg movements or alternatively, these conditions give him a record of

impairment or the managerial agents of the City of Eureka regard him as having an

impairment of a major life function. 42 U.S.C. § 12102 (1)-(4); 42 U.S.C. § 12111 (8).

22.    The conduct of the City of Eureka acting through its managerial agents in

refusing to allow Wilson to return to work as a police officer when police officer

positions specifically alleged in ¶ 15 & 16 is discrimination against a qualified

individual with a disability in violation of the Americans With Disabilities Act. 42

U.S.C. § 12112 (a).

#### 2.    Illinois Human Rights Act

23.    Wilson's conditions of cubital tunnel syndrome and herniated C-6-C-7

disc as existing and the residual effects after the surgeries as specifically alleged in ¶ 7-

10 and ¶ 9-14 are physical and mental characteristics that are a disability as defined by the Section 1-103 (I) of the Illinois Human Rights Act. 775 ILCS 5/1-103 (I) (2010).

24.     The conduct of the City of Eureka acting through its managerial agents in refusing to allow Wilson to return to work as a police officer when police officer positions specifically alleged in ¶ 15 & 16 which is discrimination against a person with a disability in violation of Section 2-102 of the Illinois Human Rights Act. 775 ILCS 5/2-102 (2010).

### 3.     Illinois Municipal Code

25.     The City of Eureka is receiving benefits from the United States based on a population of more than 5,000 persons; at all times material here, the City of Eureka had a population of more than 5,000 persons.

26.     Wilson as a police officer employed by a municipality with a population of more than 5,000 persons was entitled to disability leave for the time he was off work for the injuries suffered while in the performance of his duties as specifically alleged in ¶ 7- 15 and was entitled to leave under Section 10-2.1-23 of the Illinois Municipal Code and was entitled to return to work in his position as a police officer when released to return to light duty by his treating physician on November 24, 2010 as specifically alleged in ¶ 6 & 15 under Sections 10-2.1-17, 10.2.1 -23 & 10-2.1-24 of the Illinois Municipal Code. 65 ILCS 10-2.1-17, 10.2.1-23, & 10-2.1-24 (2010).

### V.
### Relief Sought

27.     As a direct and proximate result of the discrimination against Wilson by

the City of Eureka contrary to the Americans With Disabilites Act and the Illinois

Human Rights Act, Wilson has lost income in the amount of $36,400, benefits of $7,700,

and accumulated personal time of $3,780, a total of $47,884 in lost income and benefits

offset by earnings in part time employment at Wal-Mart of $285 for net loss of income

and benefits of $47,615.85 the computation of which is truly set forth in the Excel

spreadsheet that is Ex:1; further Wilson has endured pain and suffering with mental

distress and will continue to lose income in the future until restored to his employment

as a police officer.

28.     Wilson is entitled to an injunction reinstating him as a City of Eureka

police officer with back pay lost during his absence from employment under the

Americans With Disabilities Act, the Illinois Human Rights Act, and the police line of

duty injury provisions of the Illinois Municipal Code.

29.     Wilson has incurred and will incur in the future attorney's fees and

expenses in the prosecution of this action for which he is entitled to recovery as a

prevailing plaintiff under the Americans With Disabilities Act, 42 U.S.C. § 12117

incorporating 42 U.S.C. § 2000e-5 and the Illinois Human Rights Act, 775 ILCS 5/8A-104

(G).

## VI.
## Satisfaction of Preconditions to Action

30.     Wilson filed a Charge of Discrimination with the Illinois Human

Department of Human Rights on April 28, 2011 which was simultaneously filed with

the Equal Opportunity Commission under the work sharing agreement between the

17

agencies. A true copy of the Charge is attached as Ex:2. The Charge was filed within 180 days of the November 24, 2010 release of Wilson to return to work.

31.    Wilson filed a Request for Right to Sue, Voluntary Withdrawal of Charge with the Illinois Department of Human Rights; the Department entered an Order of Closure on August 5, 2011. True copies of those documents are attached as Ex:3.

32.    The Equal Employment Opportunity Commission informed Wilson on August 22, 2011 that the request for a right to sue had been forwarded to the Justice Department for action. A true copy of that document is attached as Ex:4.

33.    The Department of Justice issued a September 23, 2011 Notice of Right to Sue. A true copy of that document is attached as Ex:5. This action is filed on November 23, 2011 which is within 90 days of the receipt of the September 23, 2011 Notice of Right to Sue.

### VII.
### Prayer for Relief

**WHEREFORE,** Plaintiff, Scott Wilson, prays for judgment in his favor and against the Defendant, City of Eureka, Illinois, an Illinois Local Governmental Entity in the following particulars:

1.    Compensatory damages in the amount of Three Hundred Thousand Dollars ($300,000).

2.    An injunction directing the City of Eureka to reinstate Scott Wilson to his position as a police officer forthwith with back pay plus interest.

3.    An award of attorney's fees and expenses to Scott Wilson as prevailing plaintiff as a part of costs under 42 U.S.C. § 12117 incorporating 42 U.S.C. § 2000e-5, 775 ILCS 5/8A-104 (G).

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Respectfully submitted,


s/ Richard L. Steagall
RICHARD L. STEAGALL,
Attorney for the Plaintiff


RICHARD L. STEAGALL
RYAN S. McCRACKEN
Nicoara & Steagall
Commerce Building
416 Main Street, Suite 815
Peoria, IL 61602
Tel: (309) 674-6085
Fax: (309) 674-6032
nicsteag@mtco.com

19